IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IVAN PAUL WARD, III, | ) | Case No. 4:18-cv-1552 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

## I.    Introduction

Plaintiff, Ivan Paul Ward, III, seeks judicial review of the final decision of the Commissioner of Social Security, denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XIV of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).  Because the Administrative Law Judge ("ALJ") failed to apply proper legal standards in evaluating the state agency consultants' opinions, I recommend that the Commissioner's final decision denying Ward's applications for disability insurance benefits and supplemental security income be VACATED and that Ward's case be REMANDED for further consideration.

## II.      Procedural History

On December 17, 2015, Ward applied for DIB and SSI.  (Tr. 231-39).[1]  Ward alleged that

he became disabled on July 7, 2013, due to "1-eye blind shadow on the side, lungs-asthmatic

severe was on life support in 2005, back-stenosis and arthritis and bulging disks, PTSD,

insomnia, anxiety and panic disorder, anorexic and bulimia disorder."  (Tr. 73, 89, 231, 233,

263).  The Social Security Administration denied Ward's applications initially and upon

reconsideration.  (Tr. 73-144).  Ward requested an administrative hearing.  (Tr. 184-85).

ALJ Jeffrey La Vicka heard Ward's case on January 30, 2018, and denied his claims in a March

9, 2018, decision.  (Tr. 8-72).  On June 11, 2018, the Appeals Council denied further review,

rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-5).  On July 9, 2018,

Ward filed a complaint to seek judicial review of the Commissioner's decision.  ECF Doc. 1.  On

October 19, 2018, Ward filed a motion for summary judgment, stating that the court should grant

summary judgment in his favor for the reasons stated in his merits brief.  ECF Doc. 11.

## III.     Evidence

### A.       Personal, Educational and Vocational Evidence

Ward was born on April 4, 1985, and he was 28 years old on the alleged onset date.

(Tr. 231, 233).  Ward had a GED.  (Tr. 40-41).  He also had previous work experience as a

stacker and rack loader, which the ALJ determined he could no longer perform.  (Tr. 22, 69).

### B.       Relevant Medical Evidence

#### 1.        Physical Health Treatment Records

Because Ward's arguments focus on his alleged mental health-related disability, it is

unnecessary to set forth a detailed history of how his physical health issues were treated or

---

[1] The administrative transcript is in ECF Doc. 10.

evaluated.  The following captures the key parts of his physical health care records that reveal information about his mental status and/or the consistency of his complaints.

On February 22, 2013, November 18, 2013, September 15, 2014, October 21, 2014, and March 24, 2015, Ward went to the emergency department with "mild" to "moderate" respiratory distress due to asthma.  (Tr. 606-09, 620-25, 655-61, 663-66, 672-77).  During his emergency department visits, Ross Lentini, MD, and Marian Barnett-Rico, MD, noted that Ward was cooperative and pleasant, and he improved with asthma medications.  (Tr. 608-09, 622-24, 657-60, 666).  On March 24, 2015, Antony Cesario, CNP, noted that Ward had no back or joint pain, no anxiety symptoms, normal range of motion in his extremities, and normal mood, sleep, and appetite.  (Tr. 672, 676).

On March 2, 2013, Charles Payne, DO, admitted Ward to the hospital after he complained that he had chest pain and coughed up blood and mucous.  (Tr. 389, 589).  Dr. Payne noted that Ward was pleasant and cooperative during his examination.  (Tr. 590).

On June 6, 2013, Ward saw his primary care physician, Mumtaz Husain, MD, for a checkup and asthma medication refills.  (Tr. 912).  Dr. Husain noted that Ward had persistent tooth pain, anxiety, insomnia, left eye blindness, panic disorder, asthma, steroid-induced diabetes, and "very poor compliance with treatment."  (Tr. 912).  On examination, Dr. Husain noted that Ward was conversant, his lungs were clear, and his extremities were normal.  (Tr. 912).

In June and July 2013, Ward twice went to the emergency department for back pain.  On June 22, 2013, Ward reported that his back pain began after he fell out of his truck in May 2013, and on July 11, 2013, Ward said that he hurt his back lifting 50-pound bags while working at home.  (Tr. 408, 496, 498).  During his June 22 emergency department visit, Allison Callahan, PAC, noted that Ward denied any weakness in his lower extremities, was pleasant, had some

3

pain in his back, and had normal range of motion and gait.  (Tr. 408-09).  During his July 2013, visit, Brian Richardson, MD, noted that Ward had limited range of motion in his back, but he did not have any limitations in his extremities or gait.  (Tr. 499, 501).  Callahan and Dr. Richardson both gave Ward Vicodin, and they directed Ward to follow up with Dr. Husain.  (Tr. 409, 501, 503).  On June 25, 2016, Ward asked Dr. Thomas to refill his Vicodin, and Dr. Thomas noted that Ward was likely "over using the Vicodin and not using it properly."  (Tr. 486).

On July 16, 2013, Ward saw Dr. Husain for a follow-up related to his back pain.  (Tr. 914).  On examination, Dr. Husain noted that Ward was alert, oriented, and conversant.  (Tr. 914).  At follow-ups on July 26, 2013, August 27, 2013, September 4 and 27, 2013, and October 24, 2013, Dr. Husain also noted Ward's insomnia and anxiety were controlled through medication.  (Tr. 414-15, 421-22, 469-72, 480-81, 916-22).

On July 25, 2013, Ward told Joel Siegal, MD, that he had constant, throbbing back and neck pain that began after he lifted bags at work.  (Tr. 464, 475).  He also complained that he had anorexia, wheezing, difficulty walking, and anxiety.  (Tr. 475).  On examination, Dr. Siegal noted that Ward was in no acute distress, was alert and oriented, and had intact cognition.  (Tr. 475-76).  Dr. Siegal renewed Ward's Vicodin prescription.  (Tr. 466, 479).

On September 13, 2013, Amanda Davidson, PT, evaluated Ward's functional capacity on referral from Dr. Husain.  (Tr. 508-38, 541-72).  Based on her testing, Davidson stated that Ward would be unable to return to work due to his disc derangement throughout the spine, inability to maintain proper postures, and weakness.  (Tr. 509).  Davidson noted, however, that Ward might have magnified his pain due to frustration and not being able to do what he would like to do.  (Tr. 509).  Davidson recommended that Ward not be cleared to return to work.  (Tr. 509).

On November 21, 2013, Ward told Dr. Husain that he felt "much better" after he took his asthma medications and antibiotics, and he also requested valium and Vicodin refills for his

4

chronic back pain.  (Tr. 923).  Dr. Husain noted that Ward was conversant, alert, and oriented, had an appropriate affect, and controlled his insomnia and anxiety with treatment.  (Tr. 923).  On March 19, 2014, Dr. Husain noted that he wanted to wean Ward off valium.  (Tr. 933).

On February 7, 2014, Ward went to the emergency department for abdominal pain, headache, vomiting, dizziness, and a runny nose.  (Tr. 627).  On examination, Dr. Payne noted that Ward was pleasant and cooperative.  (Tr. 630).

On March 22, 2014, Ward again went to the emergency department for vomiting and abdominal pain.  (Tr. 644).  Ward told Ashley Kinsey, PA, that he did not eat well or drink enough, and Ward's wife said that he had an eating disorder.  (Tr. 644).  On examination, Kinsey noted that Ward was alert, cooperative, had no pain or limitations in his extremities, and had full muscle strength.  (Tr. 646).  Kinsey diagnosed Ward with nausea, noted that he had no activity restrictions and could return to work.  (Tr. 657, 650).

On June 16, 2015, Dr. Barnett-Rico noted that Ward was diagnosed with anorexia. (Tr. 681).  Nevertheless, on examination, Dr. Barnett-Rico noted that Ward was well-nourished, well-developed, and cooperative.  (Tr. 681).  On June 13, 2017, Ward saw Dr. Barnett-Rico for a toe injury, and Dr. Barnett-Rico noted that Ward had no gastrointestinal issues, no weight loss or weakness, no decreased range of motion or back pain, and no depression, anxiety, or sleep issues.  (Tr. 1002-03).

On August 9, 2015, Ward's wife found him unconscious after he went out drinking with friends, said that he smoked marijuana, and "suspected he was taking other drugs."  (Tr. 687). Ward told Joseph Matua, DO, that he was "a diabetic who has been at the bar doing shots and drinking beer," and that he had vomited six times.  (Tr. 687).

### 2. Mental Health Treatment Records

On October 12, 2015, Ward saw Kathy Enterline, MSW, because the court ordered him to go to anger management counseling after he was arrested for domestic violence.  (Tr. 714-18). Ward told Enterline that he had social anxiety, isolation, anhedonia, worry, feelings of guilt due to unemployment, and nightmares about a childhood attack during which he lost his left eye. (Tr. 714).  Ward told Enterline that he helped his parents run a bar and maintain apartments that they owned, but he was unable to maintain employment due to his back and eye injuries. (Tr. 715).  Enterline diagnosed Ward with anxiety disorder and PTSD, noted that he had normal weight and a cooperative attitude, did not note any impairment to Ward's thought processes or perception, and stated that his therapy would focus on anger management, reduced anxiety, and learning coping skills.  (Tr. 715, 718, 724).  Ward attended two additional therapy sessions on October 28 and December 7, 2015; however, he quit going to therapy sessions and was discharged from services on March 28, 2016.  (Tr. 722-26, 760-61).

On October 12, 2015, Ward completed a self-assessment as part of his counseling intake process.  (Tr. 720-21).  Ward stated that he did not have any physical or mental disabilities, but he endorsed difficulty walking, difficulty breathing, arthritis, and asthma. (Tr. 720).  He stated that he had no problems with nutrition, eating, appetite, or liquids; however, he said that he had unexplained weight loss.  (Tr. 720).  Ward also stated that he exercised.  (Tr. 720).

On July 12, 2016, Ward saw Koteswara Kaza, MD, for psychiatric treatment. (Tr. 783-92).  Ward told Dr. Kaza that he had panic attacks, difficulty sleeping, anxiety that made him feel sick, difficulty going anywhere, and daily anger.  (Tr. 783).  Ward said that he avoided everyone, felt hopeless and worthless, and did not do anything other than sit at his table all day.  (Tr. 783).  Ward and his mother told Dr. Kaza that he went days without eating, then would binge eat, and make himself throw up.  (Tr. 783).  Ward said he drank every day, smoked

"a few" cigarettes every day, enjoyed throwing a football around, and had trouble going places and doing things with his kids.  (Tr. 786-87).  On examination, Dr. Kaza noted that Ward was cooperative and pleasant, and he did not note any problems with Ward's thought content, perceptions, thought processes, or cognition.  (Tr. 789-90).  Dr. Kaza prescribed medications to control Ward's anxiety and depression.  (Tr. 790-91).  Dr. Kaza also ordered a drug test, tested positive for marijuana and negative for any other drugs.  (Tr. 791, 793-94).  On July 26, 2016, Ward told Dr. Kaza that his medications were not working, and that he had panic attacks twice a day.  (Tr. 779).  Dr. Kaza did not note any significant changes on examination, adjusted Ward's medications, and recommended psychotherapy.  (Tr. 779-81).  On August 13, 2016, Ward admitted to Dr. Kaza that he used marijuana, and Dr. Kaza told Ward to stop using marijuana because it could increase his anxiety and depression.  (Tr. 778).  On November 3, 2016, Ward told Dr. Kaza that he felt more anxious, had intolerable side effects from his medications, stopped taking his medications, and had some hallucinations.  (Tr. 1167).  Dr. Kaza noted that Ward had logical thought processes, appropriate behavior, and changes in his daily living activities.  (Tr. 1167).  He adjusted Ward's medications, and Ward refused psychotherapy. (Tr. 1169).

From September 1, 2016, through January 4, 2018, Ward saw Maria Craig, PA, for 16 medication management sessions.  (Tr. 1135-66, 1171-91).  During his examinations, Craig regularly noted that examination, Ward was alert, oriented, cooperative, and that he had logical thought processes.  (Tr. 1135-66, 1171-91).   On September 1, 2016, Ward told Craig that his medications did not help him, and he continued to have panic attacks, anxiety, and depression. (Tr. 1164).  Ward also stated that he had not used marijuana for "a couple weeks."  (Tr. 1164). On January 11, 2017, Ward told Craig that his antianxiety medication worked well.  (Tr. 1177). On February 16, 2017, Ward said that he felt "horrible" after being without medications for two

days, and that he saw things and heard voices calling his name.  (Tr. 1180).  On March 16, 2017,

Ward said that his moods continued to oscillate, and that he had not left his home since his last

doctor's visit.  (Tr. 1183).  Craig adjusted Ward's medication.  (Tr. 1185).  On May 16, 2017,

Ward said that he felt much better, but he continued to have auditory hallucinations.  (Tr. 1189).

Craig noted that Ward was alert, logical, and cooperative, and she continued Ward's

medications.  (Tr. 1190-91).  On June 13, 2017, Ward told Craig that he had an upset stomach

and still had trouble regulating his moods, but he had better control over his anger.  (Tr. 1160).

Ward had increased depression on January 11 and August 10, 2017; however, on September 7,

2017, Ward said that he was "doing good" and his anxiety was "okay," so long as he kept to

himself.  (Tr. 1150, 1153, 1157).  On October 5, 2017, Craig noted that Ward was better able to

control himself, though he continued to have some anxiety, depression, and anger symptoms

through January 4, 2018.  (Tr. 1135-39, 1141-49).

C.     Relevant Opinion Evidence

1.     Treating Physician Opinion—Mumtaz Husain, MD

On December 13, 2013, the Industrial Commission of Ohio, received a letter from

Dr. Husain, stating:

> This letter is to attest to the condition of Ivan Ward a current patient in my
> practice.  [Ward] has suffered two separate injuries to his back causing multiple
> medical problems including thoracic sprain and lumbar sprain.  The first injury
> we saw in office was due to a fall from a truck while at his place of employment
> and was treated for a compression facture.  When he was released for light duty at
> work he suffered another injury and went to the emergency room he was treated
> for aggravation to a preexisting disc protrusion at L3-4 as well as the lumbar and
> thoracic strains.  The patient was given leave from his employment and is under
> continued follow-ups and treatment in our office.

(Tr. 459).

8

## 2.    Consultative Examiner—Claudia Johnson-Brown, Ph.D.

On March 2, 2016, Claudia Johnson-Brown, Ph.D., issued a report based on her February 23, 2016, interview and examination of Ward.  (Tr. 745-54).  Ward told Dr. Johnson-Brown that he received mental health counseling and had presented to the emergency department several times for anxiety, but he was never hospitalized.  (Tr. 747).  He reported smoking "one or two" cigarettes, but denied using alcohol or illegal drugs.  (Tr. 748).  He said he lost 130 pounds the prior year, and that he weighed 170 pounds.  (Tr. 748).  He said he used a cane to walk at times.  (Tr. 748).  Ward said that he was nervous most of the time, went several days without sleeping, and had mood swings, racing thoughts, and impulsive behavior.  (Tr. 748).  Ward also said that he was never hungry and vomited after he ate.  (Tr. 749).  He said that he had difficulty getting along with others at work, argued, fought, and avoided others.  (Tr. 749).  Ward said he had panic attacks, was bothered by crowds, and stayed at home most of the time to keep away from people.  (Tr. 749).  Ward told Dr. Johnson-Brown that he did not have a regular schedule, spent most of the day watching TV and playing with his baby, and did not have any hobbies or friends.  (Tr. 751).

On examination, Dr. Johnson-Brown noted that Ward did not use any walking aids during the interview, did not appear to have a gait disturbance, and appeared to have normal motor activity.  (Tr. 748).  Ward's speech was clear, well-formed, goal-directed, and responsive.  (Tr. 748).  She noted that Ward attempted to be pleasant and cooperative, but was sometimes angry, irritable, depressed, and anxious.  (Tr. 748).  Ward was alert and oriented.  (Tr. 750).  He had "somewhat impaired" concentration, but he had intact recall, generally good insight, and "marginally adequate" judgment.  (Tr. 750-51).

In assessing Ward's functional capacity, Dr. Johnson-Brown stated that he would have little difficulty understanding, remembering, and carrying out instructions.  (Tr. 752).  Ward had

9

a "somewhat impaired" ability to maintain attention and concentration to perform simple and multi-step tasks. (Tr. 752). He had difficulty interacting appropriately with coworkers and supervisors. (Tr. 752). Further, his difficulty with other people, anger, mood swings, and panic attacks would "interfere greatly with his ability to withstand the stresses and pressures associated with day-to-day work activity or pressures." (Tr. 753).

### 3. State Agency Consultants

On January 18, 2016, state agency consultant Steve McKee, MD, assessed Ward's physical functional capacity based on a review of the medical record. (Tr. 81-83, 86-87). Dr. McKee determined that Ward could occasionally lift up to 50 pounds; frequently lift up to 25 pounds; stand and/or walk for 6 hours in an 8-hour workday; sit for 6 hours in an 8-hour workday; and push and/or pull without limitation. (Tr. 81-82). Ward could not see with his left eye or climb ladders, ropes, and scaffolds. (Tr. 82-83). He could occasionally climb ramps/stairs, stoop, and crawl. (Tr. 82). He was unlimited in his ability to balance, kneel, crouch, and tolerate cold, heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gasses, and poor ventilation. (Tr. 82-83). Dr. McKee also stated that Ward should avoid all exposure to hazards, such as machinery and heights. (Tr. 83). Dr. McKee determined that Ward could perform medium work. (Tr. 86-87). On June 17, 2016, Gerald Klyop, MD, concurred with Dr. McKee's opinion. (Tr. 117-119, 123).

On March 8, 2016, state agency consultant Stanley Kravitz, Ph.D., assessed Ward's mental functional capacity based on a review of the medical record. (Tr. 79-80, 83-85). Dr. Kravitz determined that Ward did not meet the criteria for Listing 12.04 (affective disorders) or Listing 12.06 (anxiety-related disorders), specifically noting that Ward had no extended episodes of decompensation and only moderate limitations to his daily living activities, social functioning, and concentration, persistence, or pace. (Tr. 79-80). Dr. Kravitz stated that Ward

10

did not have any significant limitations in his ability to: remember locations and work-like procedures; understand, remember, and carry out short, simple, or detailed instructions; perform activities within a schedule; maintain regular attendance; be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; make simple work-related decisions; maintain socially appropriate behavior; adhere to basic standards of neatness and cleanliness; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places and use public transportation; and set realistic goals or make independent plans. (Tr. 84-85). Ward was moderately limited in his ability to maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; ask simple questions or request assistance; accept instructions and respond appropriately to supervisor criticism; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the workplace. (Tr. 84-85). Dr. Kravitz also explained that Ward could only interact with others on a superficial basis, he "require[d] a separate work area in a non-public setting with occasional routine contacts with others," and he would require "occasional supervision to maintain quality and productivity." (Tr. 85). On June 15, 2016, Robyn Murry-Hoffman, Ph.D., concurred with Dr. Kravitz's opinion. (Tr. 115-16, 120-22).

### D.    Relevant Testimonial Evidence

Ward testified at the ALJ hearing. (Tr. 35-64). Ward testified that he was married for 14 years at the time of the hearing, and he had five children with his wife. (Tr. 35-36). His wife did not work. (Tr. 36). Ward said that he interacted with his children for about an hour each day. (Tr. 37). Ward lived in government housing, and he had to go up 20 steps to enter his apartment.

(Tr. 38-39).  Ward left his apartment only once a month for doctors' visits.  (Tr. 39).  He had a driver's license, but he did not have a car.  (Tr. 39).  Ward smoked "maybe seven" cigarettes per day, which his wife bought with money from his parents and her mother.  (Tr. 40).  His only income was from "family help."  (Tr. 41).  Ward testified that he did not cook, use a microwave, or shop.  (Tr. 52).  He said he spent his whole day sitting at the table, and any conversation he had with anyone "turn[ed] into a[n] argument and a fight."  (Tr. 52).  When asked where he was going in 2017, when according to his own report, he slipped while jogging down steps, he said he did not remember.  (Tr. 53).  Ward testified that he got a tattoo from his friend, but also stated that he did not have any friends because he did not get along with anyone.  (Tr. 45, 58).

Ward testified that he last worked for a year and a half as a laborer, stacking 50-pound bags.  (Tr. 43).  He worked as a stacker until he got hurt in 2013 and received an $800 settlement.  (Tr. 41-42, 44, 54).  Before that job, he worked as a laborer at a foundry, lifting molds and sliding them down a rack, from 2011 through 2012.  (Tr. 44).  Ward said that he had other laborer jobs, but he could not recall when he had those jobs or what he did at them.  (Tr. 44-45).

Ward testified that his anxiety interfered the most with his ability to work.  (Tr. 46).  He said that he had panic attacks every day and for "several hours," which were worse when he was around other people.  (Tr. 56).  During his anxiety attacks, ward blacked out and passed out.  (Tr. 64).  Ward also had anger issues, which caused him to "get mad for no reasons at all" and "get violent."  (Tr. 55, 57).  Ward also had difficulty concentrating and remembering things.  (Tr. 57-58).  Ward took antianxiety and blood pressure medications, but he said that his doctors didn't tell him what his other medications were for because he "won't take them."  (Tr. 47).  He said that his medications made him tired, pass out, and get sick.  (Tr. 48, 54).  Ward also stated

that his medications changed "every month," because he could not find anything that worked. (Tr. 54).

Ward testified that he had lower and upper back pain, which caused his legs to feel numb sometimes.  (Tr. 58-59).  His back pain got worse when he sat too long in the same spot, and he had to shift positions every 15 minutes.  (Tr. 59).  He did not stand in one place, and used a reclining chair to feel comfortable.  (Tr. 59-60).  Ward said that he could walk about 100 feet before he had to rest, and he could not carry his 12- to 13-pound son.  (Tr. 60).  He had physical therapy for his back after his 2016 injury, but he did not have any physical therapy in the two years before his hearing.  (Tr. 47).  Ward also stated that he was blind in his left eye, and he regularly used an inhaler for asthma.  (Tr. 63-64).  He had a bronchoscopy and eye surgery in 2000, and he did not have any other surgeries.  (Tr. 46-47).

Ward testified that he lost a total of 120 pounds over 6 months due to anorexia and bulimia; however, he was not sure whether he had significant weight changes in the two years before the ALJ hearing.  (Tr. 35, 61-62).  Ward said that he would go four to five days without eating until someone made him eat, and that he felt like he had the flu and puked within 20 minutes after eating.  (Tr. 62).  Ward also stated that he had trouble sleeping, and he went for days without sleeping at all.  (Tr. 63).

Ward testified that he was ordered to do community service after he was convicted of unauthorized use of his father's vehicle when he was a teenager.  (Tr. 48).  He also served two days in jail and was ordered to take anger management classes after a domestic violence conviction.  (Tr. 48).  Ward also testified that he last used marijuana a month before the ALJ hearing, and that his doctors "told [him] not to stop."  (Tr. 49).  He obtained his marijuana "through friends and stuff . . . [his] brother and different things."  (Tr. 50).  He said that his

brother gave him marijuana for free; he used it to calm down, and did not do much other than talk to his brother.  (Tr. 50).  Ward said that he never did cocaine.  (Tr. 51).

Linda Dezack, a vocational expert ("VE"), also testified.  (Tr. 65-71).  The ALJ asked the VE whether a hypothetical individual of Ward's age, education, and experience, could work if he could:

> perform light work, with allowance to alternate sitting or standing positions of up to two minutes at 30-minute intervals without going off task, who is limited to occasional postural except no climbing of ladders, ropes, or scaffolds, who must avoid concentrated exposure to extreme cold and heat, concentrated exposure to wetness and humidity, concentrated exposure to excessive vibration, concentrated exposure to irritants and chemicals, and all exposure to unprotected heights, hazardous machinery and commercial driving, who is limited to occupations requiring vision in only one eye, in other words monocular vision, whose work is limited to simple, routine, and repetitive tasks requiring only simple decisions with no fast-paced production requirements and few workplace changes, who is to have no interaction with the public and only occasional interaction with coworkers and supervisors.

(Tr. 67-68).  The VE stated that such an individual could work as a clothes folder, laundry sorter, and garment bagger.  (Tr. 69).  The VE also testified that, if an individual were late or absent for more than one or two days per month, he could not work.  (Tr. 69-70).  Further, the VE testified that an individual could be off-task for 10% of the workday, outside of the standard 15-minute morning and afternoon breaks and 30-minute lunch break.  (Tr. 70).  On examination by Ward's attorney, the VE stated that, depending on severity, verbal anger outbursts would receive a verbal warning first, then a written warning, and then result in termination; however, they could result in immediate termination if severe enough.  (Tr. 71).

## IV.     The ALJ's Decision

The ALJ's March 9, 2018, decision found that Ward was not disabled and denied his applications for DIB and SSI.  (Tr. 11-24).  The ALJ found that Ward had not engaged in substantial gainful activity since July 7, 2013, the alleged onset date.  (Tr. 13).  The ALJ found that Ward had the severe impairments of: lumbar spine degenerative disease, asthma, vision

impairment, affective disorder, and anxiety disorders.  (Tr. 13).  The ALJ stated that Ward's

anorexia was nonsevere, because there was "no evidence of any independent functional

limitations related to this condition, and he has had a normal BMI throughout the relevant time

period."  (Tr. 14).  The ALJ also stated that, even if Ward's anorexia were a severe impairment,

the RFC finding "adequately accommodated it by limiting [Ward] to light exertional work, with

additional postural, environmental, and mental limitations."  (Tr. 14).

The ALJ determined that Ward had no impairment or combination of impairments that

met or medically equaled the severity of any of the listed impairments in 20 C.F.R. Part 404,

Subpart P, Appendix 1.  (Tr. 14).  The ALJ considered Ward's mental impairments "singly and

in combination," and found that they did "not meet or medically equal the criteria of listings

12.04 (depressive, bipolar, and related disorders) [or] 12.06 (anxiety and obsessive-compulsive

disorders)."  Specifically, the ALJ noted that Ward did not meet the paragraph B criterial under

either listing, because:

> In being able to understand, remember or apply information, which concerns
> learning, recalling, and using information to perform work activities, the claimant
> has moderate restrictions.  In the claimant's ability to interact with others, the area
> that refers to the claimant's capacity to interact independently, appropriately, and
> effectively with other individuals on a sustained basis, the claimant has moderate
> difficulties.  With regard to the claimant's ability to concentrate, persist, or
> maintain pace, the area refers to the claimant's ability to sustain focused attention
> and concentration sufficiently long enough to permit the timely and appropriate
> completion of tasks commonly found in work settings, the claimant has moderate
> difficulties.  With regard to the claimant's ability to adapt and/or manage himself,
> which refers to one's ability to regulate emotions, control behavior, and maintain
> well-being in a work setting, the claimant has moderate difficulties.

> Despite the fact that the claimant's representative argues that the claimant meets
> listings 12.04 and 12.06, the objective medical evidence simply does not support
> the nature or severity of the claimant's reported mental symptoms.  As detailed
> fully below, the claimant's routine mental health treatment, with evidence of
> improvement with such treatment, in combination with his mental status
> examination findings by his treating sources and by the mental status consultative
> examiner, as well as his activities of daily living, which includes drinking at a bar
> and buying marijuana from friends and others, support no more than moderate
> mental limitations across the board.

(Tr. 15).  The ALJ also found that Ward did not meet the Paragraph C criteria under Listings

12.04 or 12.06.  (Tr. 16).

> The ALJ determined that Ward had the RFC to perform light work, except that:
>
> [Ward] must be allowed to alternate sitting or standing positions for up to
> 2 minutes at 30 minute intervals without going off task; can never climb ladders,
> ropes, or scaffolds; can occasionally climb ramps or stairs, balance, stoop, kneel,
> crouch, and crawl; must avoid concentrated levels of exposure to extreme cold,
> extreme heat, wetness, humidity, excessive vibration, chemicals, and irritants,
> such as fumes, odors, dust, and poorly ventilated areas; must avoid all exposure to
> unprotected heights, hazardous machinery, and commercial driving; is limited to
> occupations requiring vision in only one eye, is limited to simple, routine, and
> repetitive tasks, requiring only simple decisions, with no fast-paced production
> requirements and few work place changes; and is capable of no interaction with
> the public and only occasional interaction with co-workers and supervisors.

(Tr. 16).  The ALJ stated that, in assessing Wards' RFC, he "considered all symptoms' in light of

the medical and other evidence in the record."  (Tr. 16).  The ALJ noted that Ward said he had

"anorexia/bulimia," lost 127 pounds, and could go 4-5 days without eating.  (Tr. 17).  The ALJ

also noted that Ward went to the hospital after drinking beer and shots at a bar in 2015; that he

had used marijuana one month before the hearing to "calm[] down"; and that he got his

marijuana from his friends, brother, and "other people."  (Tr. 17, 20–21).  The ALJ stated that

Ward's subjective complaints of social anxiety were inconsistent with, among other things, his

bar-going and marijuana acquisition.  (Tr. 21).  Furthermore, the ALJ noted that Ward had a

limited work history, rarely resulting in yearly earnings at the substantial gainful activity level,

which "rais[ed] some questions as to whether r the present lack of substantial gainful activity

level income is related to [his] alleged impairments as opposed to other reasons."  (Tr. 21).

The ALJ stated that, in evaluating Ward's RFC, he gave "partial weight" to Dr. McKee's

and Dr. Klyop's opinions.  (Tr. 21).  The ALJ explained that their opinions were "generally

consistent" with the record, but that Ward's continued treatment for back pain and asthma was

"better accommodated with a limitation to light work."  (Tr. 21).  The ALJ gave "great weight"

to Dr. Kravitz's and Dr. Murry-Hoffman's opinions – that Ward could perform a range of unskilled, low-stress work with social interaction limitations.  (Tr. 22).  The ALJ stated that Dr. Kravitz's and Dr. Murry-Hoffman's opinions reflected a thorough review of the record and were supported by Ward's routine treatment with evidence of improvement, no more than moderate abnormal examination findings, and daily living activities.  (Tr. 22).  The ALJ also gave "partial weight" to Dr. Johnson-Brown's opinion, because "her statements regarding [Ward's] mental limitations are quite vague and appear to be based primarily [on Ward's] subjective reports . . . rather than her objective findings, which were only marginally abnormal." (Tr. 22).

Because Ward was unable to perform all or substantially all of the requirements of light work, the ALJ relied on the VE's testimony to determine whether Ward could perform a significant number of jobs at the light exertional level with additional limitations.  (Tr. 23). Based on the VE's testimony and considering Ward's RFC, age, education, and experience, the ALJ found that Ward was "able to perform the requirements of representative occupations such as clothes folder, . . . laundry sorter, . . . and garment bagger."  (Tr. 23).  In light of his findings, the ALJ determined that Ward was not disabled from July 7, 2013, through the date of his decision and denied Ward's applications for DIB and SSI.  (Tr. 23-24).

## V.    Law & Analysis

### A.    Standard of Review

The court's reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. §§ 405(g), 1383(c)(3); *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003). Substantial evidence is any relevant evidence, greater than a scintilla, that a reasonable person

would accept as adequate to support a conclusion. *Rodgers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  If supported by substantial evidence and reasonably drawn from the record, the Commissioner's factual findings are conclusive – even if this court might reach a different conclusion or if the evidence could have supported a different conclusion. 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Elam*, 348 F.3d at 125 ("The decision must be affirmed if . . . supported by substantial evidence, even if that evidence could support a contrary decision."); *Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record.").  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if supported by substantial evidence, however, the court will not uphold the Commissioner's decision when the Commissioner failed to apply proper legal standards, unless the error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error.").  Furthermore, the court will not uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant

evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010). Requiring an accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(i)–(v), 416.920(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). Although it is the Commissioner's obligation to produce evidence at Step Five, the claimant bears the ultimate burden to produce sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. §§ 404.1512(a), 416.912(a).

**B. Severe Impairment**

Ward argues that the ALJ erred by finding that his bulimia was not a severe impairment at Step Two of the sequential evaluation. ECF Doc. 12 at 19-20. He asserts that his bulimia could be expected to have more than a minimal impact on his job performance, especially considering that he "had to reschedule a consultative exam because he had been up all-night vomiting." *Id.* at 19.

19

The Commissioner responds that the ALJ did not err in finding Ward's bulimia nonsevere, because Ward did not carry his burden to show that more than minimal functional limitations due to bulimia. ECF Doc. 14 at 18-20. Further, the Commissioner notes that the ALJ found multiple severe impairments and proceeded to consider all of Ward's impairments, including his eating disorders, in evaluating his RFC. *Id.* at 19.

At the second step of the sequential analysis, the ALJ considers whether the claimant has a "severe impairment." 20 C.F.R. §§ 404.1520(a)(4)(ii), (c), 416.920(a)(4)(ii), (c). Step Two is a threshold inquiry "intended to 'screen out totally groundless claims.'" *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576 (6th Cir. 2009) (quoting *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985)). The Sixth Circuit has applied a *de minimis* standard to the Step Two inquiry, meaning that the ALJ must find that a claimant's medically determinable impairment is severe, so long as it has more than a minimal effect and would be expected to interfere with the individual's ability to work. *See Salmi v. Sec'y of Health & Human Servs.*, 744 F.2d 685, 691 (6th Cir. 1985) ("'An impairment can be considered as not severe only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work.'" (quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984))); *see also* 20 C.F.R. §§ 404.1521, 416.921 (stating that a "medically determinable impairment . . . must be established by objective medical evidence form an acceptable medical source"). If the ALJ determines that the claimant does not have a severe impairment, or combination of impairments, the regulations direct the ALJ to find that the claimant is not disabled. 20 C.F.R. §§ 404.1520(c), 416.920(c). However, "[a]fter an ALJ makes a finding of severity as to even one impairment, the ALJ 'must consider limitations and restrictions imposed by *all* of an individual's impairments, even those that are not 'severe.'" *Nejat*, 359 F. App'x at 577 (quoting SSR 96-8p, 61 Fed. Reg. 34474, 34477 (Jul. 2, 1996)). So

long as the ALJ considers all the claimant's impairments – severe and non-severe – in the remaining steps of the disability determination, any error at Step Two is harmless. *Nejat*, 359 F. App'x at 577 (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)).

The ALJ applied proper legal standards in evaluating the severity of Ward's impairments at Step Two. Here, the ALJ was not required to evaluate whether Ward's alleged bulimia was severe, because there were no objective medical records in which a clinician found that he had bulimia. *Salmi*, 744 F.2d at 691; 20 C.F.R. §§ 404.1521, 416.921; (Tr. 644-50) (diagnosing Ward with "nausea" when he said he vomited after eating). While a few records indicated that Ward had anorexia and vomited after eating, the ALJ adequately explained that those records did not show a severe impairment, because there was "no evidence of any independent functional limitations related to this condition, and he has had a normal BMI throughout the relevant time period" – plainly indicates that the ALJ believed Ward did not have a severe eating disorder. *Salmi*, 744 F.2d at 691; (Tr. 14). Nevertheless, even if the ALJ's failure to expressly discuss Ward's bulimia at Step Two was error, the error was harmless because the ALJ proceeded to the next steps in the sequential evaluation and considered all of Ward's severe and nonsevere impairments—including his bulimia. *Nejat*, 359 F. App'x at 577; *Maziarz*, 837 F.2d at 244; SSR 96-8p, 61 Fed. Reg. at 34477; (Tr. 16-17). Accordingly, I recommend that the court affirm the Commissioner's Step Two determination.

### C.    Listings 12.04 and 12.06

Ward argues that the ALJ erred by not finding that his depressive disorder and anxiety met or medically equaled the criteria in Listings 12.04 (affective disorders) and 12.06 (anxiety related disorders). ECF Doc. 12 at 10-14. Ward asserts that he met the paragraph A criteria for Listing 12.04, because his "depressive disorder is characterized by: depressed mood, diminished

interest in activities, feelings of helplessness and hopelessness, difficulty concentrating, mood

swings and racing thoughts, anger issues, appetite disturbance, and sleep disturbance." *Id.* at 11.

He contends that he met the paragraph A criteria for Listing 12.06, because he had "difficulty

concentrating; irritability; and sleep disturbance." *Id.*  Further, Ward argues that he met the

identical paragraph B criteria for Listings 12.04 and 12.06, because his anger and anxiety issues

diminished his ability to apply information at work, interact with others, concentrate, persist,

maintain pace, adapt, and manage himself. *Id.* at 11-14.

  The Commissioner responds that the ALJ properly found that Ward did not carry his

burden to show that he had an impairment or combination of impairments that met or medically

equaled Listings 12.04 and 12.06. ECF Doc. 14 at 9-12.  The Commissioner asserts that, looking

at the ALJ's decision as a whole, the ALJ adequately considered the evidence in the record. *Id.*

at 10-11.  Further, the Commissioner contends that the ALJ sufficiently explained that Ward's

improvement with routine treatment, daily living activities, and examination findings supported

only moderate limitations. *Id.* at 10.  Moreover, the Commissioner argues that, even if the ALJ

erred, that error was harmless because Ward has not shown that his impairments were of listing-

level severity. *Id.* at 11.

  At Step Three, the claimant has the burden of proving that he has an impairment or

combination of impairments that meet or medically equal a listed impairment. *Foster v. Halter*,

279 F.3d 348, 354 (6th Cir. 2001); 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  The

claimant is conclusively presumed disabled if he meets or medically equals a listed impairment;

otherwise, the evaluation proceeds to the fourth step.  20 C.F.R. § 404.1520(d)–(e), 416.920(d)–

(e); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *see also Rabbers*, 582 F.3d at 653 ("A claimant

must satisfy all of the criteria to meet the listing.").  "If . . . the record raises a substantial

question as to whether the claimant could qualify as disabled under a listing, the ALJ should

discuss that listing." *Sheeks v. Comm'r of SSA*, 544 F. App'x 639, 641 (6th Cir. 2013) (quotation

and alterations omitted); *see also Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 415–16

(6th Cir. 2011) (holding that the ALJ erred by not conducting any Step Three evaluation of the

claimant's physical impairments, when the ALJ found that the claimant had the severe

impairment of back pain).  Nonetheless, "the ALJ need not discuss listings that the applicant

clearly does not meet, especially when the claimant does not raise the listing before the ALJ."

*Sheeks*, 544 F. App'x at 641; *see also Hutchinson v. Bowen*, 787 F.2d 1461, 1463 (11th Cir.

1986) (stating that, when an ALJ "did not explicitly state that the appellant's impairments were

not contained in the listings, such a determination was implicit in the ALJ's decision" because he

proceeded to Step Four).  When an ALJ failed to adequately explain why the claimant's

impairments did not meet or medically equal a listed impairment, that error is harmless if the

claimant does not produce sufficient evidence to show that his impairments met or medically

equaled a listed impairment.  *See Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th

Cir. 2014).

     Listing 12.04 establishes the criteria for affective disorders, and listing 12.06 establishes

the criteria for anxiety-related disorders.  20 C.F.R. pt. 404, Subpt. P, App. 1 §§ 12.04, 12.06.

To meet the Listings' severity level for an affective disorder or an anxiety-related disorder, the

claimant must show that he meets: (1) the impairment-specific medical criteria in paragraph A;

and (2) the functional limitations criteria in paragraphs B or C.  20 C.F.R. pt. 404, Subpt. P, App.

1 §§ 12.00(A), 12.04.  Paragraph A of listing 12.04 provides that the claimant must show

medical documentation of:

> (1) Depressive disorder, characterized by five or more of the following:
> (a) depressed mood; (b) diminished interest in almost all activities; (c) appetite
> disturbance with change in weight; (d) sleep disturbance; (e) observable
> psychomotor agitation or retardation; (f) decreased energy; (g) feelings of guilt or
> worthlessness; difficulty concentrating or thinking; or (i) thoughts of death or
> suicide[; or]

(2) Bipolar disorder, characterized by three or more of the following:
(a) pressured speech; (b) flight of ideas; (c) inflated self-esteem; (d) decreased
need for sleep; (e) distractibility; (f) involvement in activities that have a high
probability of painful consequences that are not recognized; or increase in
goal-directed activity or psychomotor agitation.

20 C.F.R. pt. 404, Subpt. P, App. 1 § 12.04(A). Paragraph A of listing 12.06 provides that the

claimant must show medical documentation of:

(1) Anxiety disorder, characterized by three or more of the following:
(a) restlessness; (b) easily fatigued; (c) difficulty concentrating; (d) irritability;
(e) muscle tension; or (f) sleep disturbance[;]

(2) Panic disorder or agoraphobia, characterized by one or both: (a) panic attacks
followed by a persistent concern or worry about additional panic attacks or their
consequences; or (b) disproportionate fear or anxiety about at least two different
situations (for example, using public transportation, being in a crowd, being in a
line, being outside of your home, being in open spaces)[; or]

(3) Obsessive-compulsive disorder, characterized by one or both: (a) involuntary,
time-consuming preoccupation with intrusive, unwanted thoughts; or
(b) repetitive behaviors aimed at reducing anxiety..

20 C.F.R. pt. 404, Subpt. P, App. 1 § 12.06(A).

Paragraphs B and C of both listings are identical. Paragraph B requires that the

claimant's affective disorder or anxiety-related disorder must result in an "extreme limitation of

one or marked limitation of two, of the following areas of mental functioning: (1) understand,

remember or apply information; (2) interact with others; (3) concentrate, persist or maintain

pace; (4) adapt or manage oneself." 20 C.F.R. pt. 404, Subpt. P, App. 1 §§ 12.04(B), 12.06(B).

Paragraph C requires a:

medically documented history of the existence of the disorder over a period of at
least 2 years, and there is evidence of both: (1) medical treatment, mental health
therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing
and that diminishes the symptoms and signs of [the] mental disorder; and
(2) marginal adjustment, that is, [the claimant has] minimal capacity to adapt to
changes in [his] environment or to demands that are not already part of [his] daily
life.

20 C.F.R. pt. 404, Subpt. P, App. 1 §§ 12.04(C), 12.06(C).

24

The ALJ applied proper legal procedures and reached a decision supported by substantial evidence in determining that Ward did not have an impairment or combination of impairments that met or medically equaled Listings 12.04 and 12.06.  The ALJ complied with the regulations by expressly discussing whether Ward met the listings related to his medically determinable impairments, including Listings 12.04 and 12.06.  *Foster*, 279 F.3d at 357; *Sheeks*, 544 F. App'x at 641; *Reynolds*, 424 F. App'x at 415-16; 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii) (Tr. 14-15).  Here, the ALJ adequately explained that, considering all of Ward's impairments singly and in combination, he did not satisfy the paragraph B criteria for Listings 12.04 or 12.06, because he had only moderate difficulties in: (1) understanding, remembering, and applying information; (2) interacting with others; (3) concentrating, persisting, and maintaining pace; and (4) adapting and/or managing himself in the workplace.  20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.04(B), 12.06(B); (Tr. 15).  Further, Ward has waived – by failing to raise in his brief – any argument challenging the ALJ's conclusion that he did not meet the paragraph C criteria.  *See Swain v. Comm'r of Soc. Sec.*, 379 F. App'x 512, 517 (6th Cir. 2010) (affirming a district court's finding that a claimant waived arguments that he did not raise in his merits brief).  Nevertheless, the ALJ adequately explained that the record did not show that Ward met the paragraph C requirements.  (Tr. 16).  Substantial evidence also supported the ALJ's conclusion that Ward did not meet the paragraph B criteria for Listings 12.04 or 12.06, because: (1) providers uniformly found him cooperative, pleasant, conversant, alert, and oriented; (2) treatment notes indicated that his anxiety and insomnia were adequately controlled through medication; (3) PA Kinsey found that Ward had no activity restrictions and could work; (4) Ward told his providers and the ALJ that he went drinking with friends and bought marijuana from friends; (5) counselor Enterline and Dr. Kaza's notes did not indicate that Ward had any problems with thought processes or cognition.  (Tr. 414-15, 21-22, 469-72, 480-81, 590, 608-09, 622-24, 630, 650, 657-

60, 666, 687, 708-09, 715, 718, 724, 741, 789-90, 912, 916-23, 1062, 1135-67, 1171-91).

Accordingly, I recommend that the court affirm the ALJ's conclusion that Ward did not have an impairment or combination of impairments that met or medically equaled Listings 12.04 and 12.06.

### D. Medical Opinion Evidence

Ward argues that the ALJ erred in weighing the medical opinion evidence. ECF Doc. 12 at 14-17. Ward contends that the ALJ's reasons for giving Dr. Johnson-Brown's opinion "partial weight" – that the opinion was vague, appeared to be primarily based on Ward's subjective statements, and did not reflect the "marginally abnormal" examination findings – were not supported by substantial evidence, because Dr. Johnson-Brown conducted a thorough examination and did not report vague findings. *Id.* at 15. Further, Ward asserts that the ALJ made an improper medical judgment when he described Dr. Johnson-Brown's findings as "marginally abnormal." *Id.* at 15-16. Ward also argues that the ALJ erred in giving the state agency consultants' opinions great weight, because they did not have access to records from Dr. Kaza and Comprehensive Behavioral Health. *Id.* at 16. Moreover, Ward asserts that the ALJ did not explain the conflict between the RFC finding and the state agency consultants' opinion that he needed a "separate work area." *Id.* Finally, Ward contends that the ALJ erred by failing to state the weight given to Dr. Kaza's, Dr. Husain's, and PA Craig's opinions and records. *Id.* at 16-17.

The Commissioner responds that the ALJ was not required to state what weight he gave to Dr. Kaza, Dr. Husain, and PA Craig, because they did not provide medical opinions. ECF Doc. 14 at 15. The Commissioner also argues that the ALJ did not err in giving partial weight to Dr. Johnson-Brown's opinion, because her opinion was vague, was based on Ward's own subjective complaints, and conflicted with her examination findings. *Id.* at 15-16. Further, the

Commissioner asserts that the ALJ did not err by failing to explain why he did not include the state agency consultants' separate workspace limitation in the RFC, because there was no significant conflict between the RFC and the state agency consultants' opinion. *Id.* at 17-18. Moreover, the Commissioner asserts that, even if the separate workspace limitation were included in the RFC, there was "no indication" that it would preclude Ward from performing work. *Id.* at 18.

At Step Four, an ALJ must weigh every medical opinion the Social Security Administration receives. 20 C.F.R. §§ 404.1527(c), 416.927(c). A "medical opinion" is a statement form an acceptable medical source that describes a claimant's abilities and restrictions based on the nature and severity of his impairments. *See* 20 C.F.R. §§ 404.1527(a)(1), 416.927(a)(1); *Bass v. McMahon*, 499 F.3d 506, 510 (6th Cir. 2007) (indicating that an ALJ need not give weight to, or provide reasons for rejecting, a physician's statements that contain mere "observations" and not medical judgments). An ALJ must give a treating physician's opinion controlling weight, unless the ALJ articulates good reasons for discrediting that opinion. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). "[O]pinions from nontreating and nonexamining sources are never assessed for 'controlling weight.'" *Gayheart*, 710 F.3d at 376. Instead, an ALJ must weigh such opinions based on: (1) the examining relationship; (2) the degree to which supporting explanations consider pertinent evidence; (3) the opinion's consistency with the record as a whole; (4) the physician's specialization related to the medical issues discussed; and (5) any other factors that tend to support or contradict the medical opinion. *Id.*; 20 C.F.R. §§ 404.1527(c), 416.927(c). Generally, an examining physician's opinion is due more weight than a nonexamining physician's opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Gayheart*, 710 F.3d at 375. An ALJ does not need to articulate good reasons for rejecting a nontreating or nonexamining opinion. *See Smith v.*

27

*Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (declining to address whether an ALJ erred in failing to give good reasons for not accepting non-treating physicians' opinions).  An ALJ may rely on a state agency consultant's opinion, and may give such opinions greater weight than other nontreating physician's opinions if they are supported by the evidence.  *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 274 (6th Cir. 2015).  Further, an ALJ may rely on a state agency consultant's opinion that predates other medical evidence in the record, if the ALJ takes into account any evidence that the consultant did not consider.  *McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009).

"Even [when] an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt [a medical source's] limitations wholesale."  *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015) (unpublished).  So long as the ALJ's RFC determination considered the entire record, the ALJ is permitted to make necessary decisions about which medical findings to credit and which to reject in determining the claimant's RFC.  *See Justice v. Comm'r of Soc. Sec.*, 515 F. App'x 583, 587 (6th Cir. 2013) (unpublished) ("The ALJ parsed the medical reports and made necessary decisions about which medical findings to credit, and which to reject.  Contrary to [the claimant's] contention, the ALJ had the authority to make these determinations.").  However, an ALJ improperly "cherry-picks" evidence when his decision does not recognize a conflict between the functional limitations described in a medical opinion and the ALJ's RFC finding, and explain why he chose to credit one portion over another.  *See Rogers v. Comm'r of Soc. Sec.*, No. 5:17-cv-1087, 2018 U.S. Dist. LEXIS 68715 *44 (N.D. Ohio 2018) (citing *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013)); *see also Fleischer*, 774 F. Supp. 2d at 881 (stating that, if a medical source's opinion contradicts the ALJ's RFC finding, the ALJ must explain why he did not include the limitation in his RFC determination).

28

The ALJ applied proper legal procedures in evaluating the opinions of Dr. Johnson-Brown and Dr. Husain's and Dr. Kaza's notes. Here, the ALJ was not required to explain the weight given to Dr. Husain's or Dr. Kaza's notes, because they merely provided treatment notes and statements about Ward's diagnoses, but no judgments about Ward's functional abilities and restrictions. 20 C.F.R. §§ 404.1527(a)(1), 416.927(a)(1); *Bass*, 499 F.3d at 510. The ALJ also complied with the regulations by considering Dr. Johnson-Brown's opinion in light of the evidence as a whole, and by stating that he gave "partial weight" to Dr. Johnson-Brown's opinion. *Gayheart*, 710 F.3d at 376; 20 C.F.R. §§ 404.1527, 416.927; (Tr. 22). Further, the ALJ was not required to give good reasons for partially rejecting Dr. Johnson-Brown's opinion, because Dr. Johnson-Brown was only a one-time examiner, not a treating source. *Smith*, 482 F.3d at 876. Even so, the ALJ adequately explained that Dr. Johnson-Brown's opinion was due only partial weight because it was vague, based on Ward's subjective statements, and conflicted with her "marginally abnormal" examination findings. (Tr. 22). Substantial evidence also supported the ALJ's decision to give Dr. Johnson-Brown's opinion partial weight, because: (1) her opinion that Ward had difficulty interacting appropriately conflicted with her findings that he was pleasant and cooperative; and (2) she found that Ward had only "somewhat impaired" concentration, but had intact recall, generally good insight, "marginally adequate" judgment, and clear, goal-directed, and responsive speech. (Tr. 748-53). Accordingly, I recommend that the court affirm the ALJ's medical opinion assessment with regard to Dr. Johnson-Brown's opinions and Dr. Husain's and Dr. Kaza's notes.

However, I conclude the ALJ failed to apply proper legal procedures in evaluating Dr. Kravitz's and Dr. Murry-Hoffman's opinions. The ALJ was not precluded from relying on Dr. Kravitz's and Dr. Murry-Hoffman's opinions, because he considered all the medical opinion evidence in the record and found that their opinions were supported by the evidence. *Reeves*,

618 F. App'x at 274; *McGrew*, 343 F. App'x at 32; (Tr. 16-22).  Further, the ALJ complied with the regulations by considering Dr. Kravitz's and Dr. Murry-Hoffman's opinions in light of the other evidence in the record and by stating that he gave their opinions "great weight." Nevertheless, the ALJ erred by failing to explain his decision not to incorporate into his RFC finding Dr. Kravitz's and Dr. Murry-Hoffman's conclusion that Ward required a separate working space.  Although the ALJ was not required to incorporate the separate working space limitation into his RFC finding, at a minimum, the ALJ should have indicated whether he found any conflict between his RFC and the state agency consultants' opinions.  *Reeves*, 618 F. App'x at 275; *Rogers*, No. 5:17-cv-1087, 2018 U.S. Dist. LEXIS 68715 *44; *Fleischer*, 774 F. Supp. 2d at 881.  And, if he did, the ALJ should have explained why the limitation was omitted from the RFC.  Accordingly, I recommend that the court remand Ward's case for the ALJ to explain the conflict between the RFC and Dr. Kravitz's and Dr. Murry-Hoffman's opinions.

### E. Disability Finding

Ward argues that the ALJ erred by not finding him disabled based on his mental impairments.  ECF Doc. 12 at 17-19.  Ward asserts that he could not perform unskilled work because his mental impairments made him "unable to: maintain attention for two-hour segments; complete a normal workday without interruptions from psychologically based symptoms; get along with peers without unduly distracting them or exhibiting behavioral extremes; maintain regular attendance[; and] respond appropriately to criticism from supervisors." *Id.* at 18.  Ward also contends that the ALJ improperly based his disability finding on his assessment of Ward's character, when he stated that Ward's history of not working at the substantial gainful activity level "raise[d] a question as to whether the claimant's continuing unemployment [was] actually due to medical impairments." *Id.* at 18-19.

The Commissioner responds that Ward "essentially argues that the ALJ failed to properly evaluate his mental RFC." ECF Doc. 14 at 12.  The Commissioner asserts that the ALJ adequately considered all of Ward's diagnoses and symptoms in evaluating his RFC.  *Id.* at 12. Further, the Commissioner contends that the ALJ's decision not to include more restrictive limitations in his RFC finding was supported by substantial evidence, including the objective medical evidence, Ward's testimony and comments to his treatment providers, Ward's work history, and the state agency consultants' opinions.  *Id.* at 13-14.

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. §§ 404.1520(e), 416.920(e).  The RFC is an assessment of a claimant's ability to do work despite his impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 61 Fed. Reg. 34474, 34475 (July 4, 1996)).  "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by *all* of an individual's impairments, even those that are not 'severe.'"  SSR 96-8p, 61 Fed. Reg. at 34477.  Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant.  20 C.F.R. §§ 404.1529(a), 416.929(a).

At the final step of the sequential analysis, the burden shifts to the Commissioner to produce evidence supporting the contention that the claimant can perform a significant number of jobs in the national economy.  *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  An ALJ may determine that a clamant has the ability to adjust to other work in the national economy by relying on a vocational expert's testimony that the claimant has the ability to perform specific jobs.  *Howard*, 276 F.3d at 238.  A vocational expert's testimony in response to a hypothetical question is substantial evidence when the question accurately portrays the claimant's RFC.  *See id.* (stating that "substantial evidence

may be produced through reliance on the testimony of a vocational expert (VE) in response to a 'hypothetical' question, but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments" (internal quotation marks omitted)); *see also Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 715 (6th Cir. 2013) (unpublished) (stating that the ALJ's hypothetical question must "accurately portray[] a claimant's vocational abilities and limitations").  "An ALJ is only required to incorporate into a hypothetical question those limitations he finds credible."  *Lee*, 529 F. App'x at 715; *see also Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990) ("If the hypothetical question has support in the record, it need not reflect the claimant's unsubstantiated complaints.").

As a preliminary matter, Ward has waived by failing to raise in his brief any argument specifically challenging the ALJ's ultimate RFC assessment.  *See Swain*, 379 F. App'x at 517; ECF Doc. 12.  Nevertheless, with the exception the ALJ's error in evaluating the medical opinion evidence, the ALJ applied proper legal procedures and reached a decision supported by substantial evidence in finding that his mental and physical impairments did not cause limitations beyond those incorporated in the RFC.  Here, the ALJ complied with the regulations by considering all of Ward's alleged impairments in light of all the evidence in the record, including Ward's own testimony, the opinion evidence, and the objective clinical findings.  *Walton*, 773 F. Supp. 2d at 747; 20 C.F.R. §§ 404.1520, 416.920; SSR 96-8p, 61 Fed. Reg. at 34477; (Tr. 16-23).  Further, the ALJ did not give undue weight to Ward's statements regarding his drinking, marijuana use, and activities with his friends, but appropriately considered that information in determining whether Ward's alleged impairments and limitations were consistent with the evidence as a whole.  (Tr. 16-17, 20-21).  Substantial evidence also supported the ALJ's decision to not include the additional limitations that Ward says would have supported a disability finding, or additional limitations based on his physical symptoms, including: (1) treatment notes

indicating that Ward was cooperative, pleasant, conversant, alert, oriented; (2) medical findings that Ward had intact thought processes and cognition, only moderate limitations in getting along with others, and the ability to understand and carry out instructions; (3) findings that Ward had a normal gait and good extremity strength; (4) notes indicating that Ward was well-nourished and that his eating issues were caused by an untreated tooth ache and mouth ulcer; (5) Ward's own comments regarding his ability to go out with and obtain marijuana from friends, ; and (6) Ward's ability to control his symptoms with medication and therapy.  (Tr. 49-50, 81-83, 86-87, 117-119, 123, 390, 398, 414-15, 421-22, 469-81, 590, 595, 608-09, 622-24, 630, 644, 646, 650, 657-60, 666, 681, 687, 703, 706-09, 715, 718, 720, 724, 748-51, 789-91, 912-23, 941, 943, 987-88, 991, 1002-03, 1062, 1135-67, 11781-91).  Accordingly, I recommend that the court find no error in the ALJ's ultimate RFC finding.

The ALJ also applied proper legal procedures and reached a decision supported by substantial evidence in finding that Ward was not disabled at Step Five.  Here, the ALJ was not required to find that he was disabled based on the additional limitations Ward promotes in his merits brief, because the ALJ did not find those limitations credible, he was not required to incorporate them into his RFC finding.  *Lee*, 529 F. App'x at 715; *Blacha*, 927 F.2d at 231; (Tr. 16-23).  Furthermore, because the ALJ's hypothetical question to the VE accurately represented his RFC finding, the VE's testimony – that Ward could work as a clothes folder, laundry sorter, and garment bagger – was substantial evidence supporting the ALJ's conclusion that Ward was not disabled.  *Howard*, 276 F.3d at 238; 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v);(Tr. 16, 67-69).  In light of these findings, I would normally recommend that the court affirm the ALJ's Step Five analysis.  However, because the ALJ may conclude, upon remand, that additional limitations must be incorporated in Ward's RFC upon proper

consideration of the state agency consultants' opinions, the RFC should be reexamined upon remand.

## VI.    Recommendation

Because the ALJ failed to apply proper legal standards in evaluating the state agency consultants' opinions, I recommend that the Commissioner's final decision denying Ward's applications for disability insurance benefits and supplemental security income be VACATED and that Ward's case be REMANDED for further consideration.  In light of the foregoing, I also recommend that Ward's motion for summary judgment (ECF Doc. 11) be DISMISSED AS MOOT.

Dated: May 20, 2019

Thomas M. Parker
United States Magistrate Judge

--------------------------------------------------

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).